**Captain Stewart W. BECKETT, et al., Appellants,**

v.

**AIR LINE PILOTS ASSOCIATION, Appellee.**

No. 92–7029.

United States Court of Appeals, District of Columbia Circuit.

Argued April 20, 1993.

Decided June 15, 1993.

Order Denying Rehearing and Remanding Case July 23, 1993.

Robert F. Gore, argued the cause for appellants.

Jerry D. Anker argued the cause for appellee. With him on the brief were Gary Green, Clay Warner and Michael E. Abram.

Before: EDWARDS, RUTH BADER GINSBURG and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

Early in 1990, the Air Line Pilots Association ("ALPA") received a large payment of funds from Pan American Airways, Inc. ("Pan Am"), pursuant to a 1985 grievance settlement. Under the settlement, Pan Am agreed to make Savings Annuitization Payouts ("SAP"), in lieu of disputed pension contributions, on behalf of eligible Pan Am pilots. ALPA was to receive the SAP funds and then distribute the monies to eligible pilots. A dispute arose over the payments, however, and a lawsuit, *Fagerland v. Air Line Pilots Ass'n, Int'l,* Civ. Action No. 86–3410, was filed in District Court against ALPA by a group of former Pan Am pilots challenging the method used by ALPA to determine each pilot's share of the payout. In December 1989, the parties in *Fagerland* entered into a settlement agreement, under which the SAP funds were to be transferred to a trust account established and administered by ALPA, as trustee and agent, for distribution of the funds to the eligible pilot beneficiaries. The settlement agreement was approved by the District Court in a Consent Decree, 1989 WL 298428.

The present dispute involves a claim by 49 former pilots of Pan Am who are beneficiaries under the *Fagerland* Consent Decree. These pilots, appellants in this action, contend that, in administering the trust established for the distribution of the SAP funds, ALPA violated the *Fagerland* settlement agreement and Consent Decree. In particular, appellants assert that ALPA improperly withheld monies they were required to distribute to the appellants on the ground that, while serving as Pan Am pilots, the appellants had failed to pay certain agency shop fees to ALPA to support, *inter alia,* a sympathy strike by pilots at Eastern Air Lines, Inc. ("Eastern"). ALPA retained the appellants' SAP funds as a setoff against the delinquent agency shop fees allegedly due to ALPA. Appellants now seek to secure their

shares of the SAP monies, alleging breach of the settlement agreement and Consent Decree, and violations of trust law, the Employee Retirement and Income Security Act ("ERISA") and the Railway Labor Act ("RLA").

The District Court granted summary judgment against appellants on all claims. We reverse. First, we hold that appellants' claim constitutes an action to enforce a consent decree, properly brought by intended beneficiaries of that decree; therefore, the District Court had jurisdiction over appellants' trust claim pursuant to the well-established principle that a trial court retains jurisdiction to enforce its consent decrees. Second, we hold that, as trustee and agent under the *Fagerland* Consent Decree, ALPA had no right to divert for its own use monies required to be transferred to beneficiaries under the settlement trust.

## I. BACKGROUND

### A. *Assessments for the Eastern Sympathy Strike*

At all times relevant to this appeal, ALPA, a labor organization within the meaning of the RLA, 45 U.S.C. § 151, Sixth (1988), represented airline pilots employed by the now-bankrupt Pan Am. ALPA's collective bargaining agreement with Pan Am contained an agency shop agreement, which, as a condition of employment, required pilots who chose not to join the union to pay a "service charge" to ALPA equivalent to its regular monthly dues, initiation fee and periodic assessments. *See* Agency Shop Agreement at 1, *reprinted in* Appendix ("A.") 71. Under the agency shop agreement, if a pilot became delinquent in his payments, ALPA's Treasurer was required to notify the pilot of his delinquency and advise him that he was "subject to discharge." *Id.* If the pilot did not make the necessary payments, the agency shop agreement required the Treasurer to "certify" the delinquency to the pilot's employer, who was then obligated to discharge the pilot. *Id.* A pilot whose discharge had been requested was permitted to file a protest if he believed that the agency shop agreement had "not been properly interpret-

ed or applied." *Id.* at 2. Protests were ultimately subject to binding arbitration.

In March 1989, the International Association of Machinists and Aerospace Workers Union ("IAM"), the bargaining agent for the mechanics at Eastern, began a lawful strike against that airline. In support of the IAM, the ALPA pilots at Eastern also went on strike. ALPA's Executive Board subsequently authorized $2,400 per month in strike benefits for the Eastern pilots, to be funded by monthly assessments charged to ALPA members. A majority of ALPA's membership approved the assessments by secret vote, and voted again in September and December 1989 to continue the assessments. The assessments were discontinued at the end of February 1990.

From May 1989 to March 1990, ALPA levied eleven strike assessments to fund the benefits for the striking Eastern pilots. A number of the non-union Pan Am pilots refused to pay the assessments. By March 1990, at least 328 Pan Am pilots, including 46 of the 49 appellants, were delinquent in the payment of their assessments. (In addition, 24 of the appellants were delinquent in the payment of agency fees other than the Eastern strike assessments.) ALPA sent delinquency letters to five of the 46 appellants whose assessment payments were overdue; no other efforts were made by ALPA to pursue claims under the agency shop agreement.

### B. *The* Fagerland *Settlement Monies*

The long series of events leading to this action began in early 1990, when ALPA received a large payment from Pan Am under the terms of a 1985 grievance settlement. The settlement resolved a grievance dispute arising out of Pan Am's decision in 1984 to cease contributions to the "A Plan," a pension plan it had established for its pilots. Under the settlement, reached in February 1985, Pan Am agreed to make a SAP of $35.125 million to Pan Am pilots who had participated in the A Plan prior to January 1, 1984 ("eligible pilots"). The SAP was to be paid in equal, yearly installments of $7.025 million from 1986 to 1990. The settlement required Pan Am to pay the SAP to ALPA,

which was then to distribute the funds to the eligible Pan Am pilots. *See* Pan Am–ALPA Settlement at 3, *reprinted in* A. 47.

Before ALPA began distributing the settlement, a group of former Pan Am pilots who had been members of the "A Plan" filed suit against ALPA in the United States District Court for the District of Columbia, challenging the method ALPA used to determine each pilot's share of the payout. As a result of the suit, *Fagerland v. Air Line Pilots Ass'n, Int'l*, Civ.Action No. 86–3410, the SAP fund was placed in escrow and no distributions were made. In December 1989, the parties in *Fagerland* entered into a settlement agreement, which the District Court approved in a Consent Decree. *See* Settlement Agreement and Consent Decree, *reprinted in* A. 55 ("*Fagerland* Consent Decree" or "Consent Decree").

Under the Consent Decree, the funds held in escrow were to be transferred "to a trust account to be established by defendant ALPA, which will act as trustee and agent for distribution of this fund to the beneficiaries." *Id.* at 7. The Consent Decree provided that ALPA, "as trustee and agent," was first to distribute a specified portion of the funds to the *Fagerland* plaintiffs, and was then to distribute the remaining funds "to eligible [Pan Am] pilots who are not plaintiff class members pursuant to the instructions of the Pan Am [Master Executive Council]."[1] *Id.* at 8–11. The "eligible pilots" included appellants. The distribution plan set out in the Consent Decree applied to the four annual $7.025 million payments that Pan Am had already made (which were at the time held in escrow), and to the final payment Pan Am was scheduled to make in 1990.

In February 1990, after receiving the SAP funds from the first four annual payments, the Pan Am MEC adopted a resolution stating that:

> all [Pan Am] pilots who are delinquent in dues, service charge or assessment payments to ALPA ... as of February 20, 1990 ... shall receive their full [SAP] payment minus all the money owed to ALPA

in the form of back dues, service charges and/or assessments.

Plaintiffs' Statement of Material Facts to Which There is No Genuine Issue at 7, *reprinted in* A. 35. In March 1990, after the *Fagerland* plaintiffs had received their share of the SAP fund, ALPA distributed the remaining funds to eligible Pan Am pilots. In accordance with the MEC resolution, ALPA mailed SAP distribution checks to the pilots that included their share of the distribution from the first four Pan Am payments, less any alleged delinquency to ALPA as of February 20, 1990. ALPA withheld a total of $562,927.61 from the SAP distribution to satisfy the debts of delinquent Pan Am pilots, including $139,306.95 from appellants' share of the distribution ($100,160.47 of which constituted strike assessments, the remainder constituting other overdue fees). In December 1990, after Pan Am paid ALPA the last $7.025 million installment under the 1985 settlement agreement, ALPA made the final distribution of SAP funds to Pan Am pilots, and withheld an additional $22,340.31 from 13 of the appellants, as a further setoff for delinquency. In sum, ALPA withheld $161,647.26 from appellants.

## C. *The District Court's Decision*

On August 7, 1990, appellants filed this action in the District Court, seeking to recover the settlement money withheld by ALPA. Appellants alleged, *inter alia*, that by withholding the SAP funds, ALPA had, in addition to violating the terms of the *Fagerland* settlement agreement and Consent Decree, (1) violated the anti-alienation requirement and the fiduciary duty imposed by ERISA, 29 U.S.C. §§ 1002(21)(A), 1056(d)(1) (1988); (2) breached a fiduciary duty by diverting, for its own uses, funds it held in trust for appellants and other Pan Am pilots pursuant to the Consent Decree; and (3) violated various of appellants' rights under the RLA. After discovery, both parties moved for summary judgment.

The District Court granted summary judgment in favor of ALPA on all claims. *Beckett v. Air Line Pilots Ass'n, Int'l*, 783 F.Supp. 657 (D.D.C.1992), *reprinted in* A.

---

1. The Pan Am Master Executive Council ("MEC") is a subordinate body of ALPA.

165. The court first held that appellants' ERISA claims were "not well-founded," noting that ERISA applies "only to pension and welfare plans.... [and] [t]he mere fact that the payments were made pursuant to the settlement of a dispute relating to a pension plan does not bring them within the coverage of ERISA." *Id.*, 783 F.Supp. at 661. The trial court then dismissed the breach of fiduciary duty claim for lack of pendent jurisdiction. The court further noted that, even if it had jurisdiction, the claim was meritless, because the *Fagerland* Consent Decree did not establish a trust on behalf of appellants, who were not parties to the *Fagerland* suit. *Id.* at 661.

The trial court then ruled against appellants on the merits of the RLA claims. The court began by rejecting appellants' claim that ALPA had violated the RLA by resorting to self-help rather than exercising its rights under the agency shop enforcement procedures of the collective bargaining agreement. The District Court observed that the enforcement procedures were optional rather than mandatory, and that, therefore, ALPA "had no obligation ... to seek discharge of the pilots who refused to pay the service fees or assessments." *Id.* at 662. The trial court further held that, under the Supreme Court's recent decision in *Lehnert v. Ferris Faculty Ass'n,* —— U.S. ——, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991), the RLA permitted ALPA to charge strike assessments to the non-union Pan Am pilots to support the strike by the Eastern pilots' bargaining unit. *Beckett,* 783 F.Supp. at 663.

This appeal followed.

## II. DISCUSSION

### A. Standard of Review

This is an appeal from a grant of summary judgment. Under FED.R.CIV.P. 56(c), summary judgment is appropriate only "where there is no genuine issue of material fact, and, viewing the evidence in the light most favorable to the nonmoving party, the movant is entitled to prevail as a matter of law." *Sherwood v. Washington Post,* 871 F.2d 1144, 1146 (D.C.Cir.1989) (per curiam) (cita-

tion and internal quotations omitted). Because the material facts are not in dispute, our task is to ensure that the District Court correctly applied the relevant law to the undisputed facts. *See Abourezk v. New York Airlines, Inc.,* 895 F.2d 1456, 1458 (D.C.Cir. 1990) (per curiam). In addition, our review of the District Court's interpretation of the *Fagerland* Consent Decree is *de novo. See United States v. Western Elec. Co., Inc.,* 907 F.2d 160, 164 (D.C.Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991).

### B. Potential Theories of Recovery in This Case

This case presents a number of potential theories of recovery. Despite the many arguments before us, however, we conclude that only one theory warrants serious consideration. Accordingly, as discussed below, we hold that, under the *Fagerland* settlement and Consent Decree, ALPA held the disputed SAP funds in trust for the benefit of appellants, and that it violated its fiduciary duty to appellants when it offset their alleged debts to ALPA against those funds. We also hold that the District Court had jurisdiction to enforce the Consent Decree.

We begin by noting the theories in this case that we need *not* reach.[2] First, this action could have been filed in the District Court on the theory that ALPA breached its duty of fair representation to the non-union pilots under the RLA. *See Karahalios v. National Fed'n of Fed. Employees, Local 1263,* 489 U.S. 527, 534, 109 S.Ct. 1282, 1287, 103 L.Ed.2d 539 (1989) (noting that Supreme Court has implied a duty of fair representation under the RLA; citing *Steele v. Louisville & Nashville R.R. Co.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944)). However, both sides agree that appellants failed to pursue this theory of the case, and, therefore, we have no occasion to address it.

Second, appellants seem to contend that section 2, Eleventh (a) of the RLA requires ALPA to exhaust the agency shop procedures set out in the collective bargaining agreement—specifically, to seek discharge of

---

2. Appellants have abandoned their ERISA claims on appeal.

delinquent pilots—before resorting to self-help to collect monies due. *See* 45 U.S.C. § 152, Eleventh (a) (1988). However, appellants' counsel conceded at oral argument that no court has ever interpreted section 2, Eleventh (a) to impose such an exhaustion requirement. We intimate no position on this issue.

Third, appellants contend that the RLA prohibits ALPA from requiring non-union pilots to help pay for a union strike in another bargaining unit. This theory of the case poses two complex issues. First, we would have to decide whether appellants must arbitrate this issue before filing suit. There is a split in the circuits on this question. *Compare Hudson v. Chicago Teachers Union, Local No. 1,* 922 F.2d 1306, 1314 (7th Cir.) (holding that non-union members must arbitrate disputes over calculation of agency shop fee), *cert. denied,* — U.S. —, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991), *with Tierney v. City of Toledo,* 917 F.2d 927, 940 (6th Cir.1990) (requiring union to remove exhaustion requirement from its arbitration procedures for contesting calculation of agency shop fee). Second, even if this claim is properly before us, we would have to decide whether the Supreme Court's decision in *Lehnert v. Ferris Faculty Ass'n, supra,* permits the assessments ALPA charged to appellants. As with the section 2, Eleventh (a) claim, we need not reach these issues.

Fourth, it is possible that the fiduciary duty claim arising from the trust purportedly created by the *Fagerland* Consent Decree could be entertained as a state law claim pendent to appellants' RLA claims. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). But this theory of the case also has its difficulties. As an initial matter, appellants failed to preserve this claim on appeal because they waited until their reply brief to challenge the District Court's ruling that it did not have pendent jurisdiction over the fiduciary duty claim. "This Court, of course, generally refuses to entertain arguments raised for the first time in an appellant's reply brief." *Herbert v. National Academy of Sciences,* 974 F.2d 192, 196 (D.C.Cir.1992). More important, however, it is unnecessary to consider this theory of the case, because the District Court had jurisdiction over appellants' trust claim pursuant to the well-established principle, discussed below, that a district court retains jurisdiction under federal law to enforce its consent decree.

## C. The Trust Theory

The one viable theory of this case is appellants' trust claim. We recognize that appellants have presented a somewhat unartful description of the claim, appearing to focus their trust claim on general principles of state common law; and both sides to the dispute seem to believe that the District Court's jurisdiction over the trust claim depended on the doctrine of pendent jurisdiction. We see this case somewhat differently.

We agree with appellants that the *Fagerland* Consent Decree established a trust, pursuant to which ALPA, as trustee and agent, was to hold and then distribute the disputed funds solely for the benefit of appellants and other eligible Pan Am pilots. Further, we agree that, under fundamental principles of trust law, which we must look to in order to interpret the Consent Decree, ALPA breached its fiduciary duty to appellants when it retained a portion of the trust funds as a setoff against appellants' alleged debts to ALPA. However, we see appellants' trust claim as a *federal* claim because it arises out of the Consent Decree, and, therefore, we conclude that the pendent jurisdiction doctrine is not on point. The parties did not suggest the precise formulation of the trust claim as we now characterize it. Nevertheless, the core issues surrounding the trust theory—whether a trust was created, and, if so, whether the trustee breached its fiduciary duties to the beneficiaries—were raised by the parties and decided by the trial court and debated by the parties on appeal. In these circumstances, we consider it appropriate to reach the merits of the trust claim.

### 1. Jurisdiction

The jurisdictional issue need not long detain us. Appellants claim that ALPA, as trustee, breached its fiduciary duty in connection with the trust purportedly created by

the Consent Decree. This claim constitutes, in essence, an action to enforce that Consent Decree. The District Court therefore had jurisdiction over appellants' trust claim pursuant to the well-established principle that a trial court retains jurisdiction to enforce consent decrees and settlement agreements. *See, e.g., Hook v. State of Arizona, Dep't of Corrections,* 972 F.2d 1012, 1014 (9th Cir. 1992); *Picon v. Morris,* 933 F.2d 660, 662 (8th Cir.1991); *Aro Corp. v. Allied Witan Co.,* 531 F.2d 1368, 1371 (6th Cir.), *cert. denied,* 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976).[3] Indeed, the parties to the *Fagerland* Consent Decree acknowledged this principle. In the Consent Decree approving the settlement, the District Court expressly retained jurisdiction over the action in order to provide for enforcement, if necessary. *See* Consent Decree at 14 ("The Court will retain jurisd[ ]iction over this case to enforce the terms of this Settlement Agreement and Consent Decree...."). And, because the District Court granted summary judgment against appellants as to all claims, this court has jurisdiction over the appeal. *See* 28 U.S.C. § 1291 (1988).

### 2. *Whether Appellants May Sue to Enforce the Consent Decree*

■ Although the District Court plainly had jurisdiction to enforce the terms of the Consent Decree, a slightly more difficult question remains: whether appellants, who were not "parties" to the Consent Decree, may nevertheless sue to enforce its terms. We hold that because they are direct *beneficiaries* of a trust created by the Consent Decree, they may do so.

We begin by noting that it is already recognized that "intended third party beneficiaries of a consent decree have standing to enforce the decree." *Hook,* 972 F.2d at 1014; *accord Berger v. Heckler,* 771 F.2d 1556, 1565–66 (2d Cir.1985). This is so because consent decrees are generally construed ac-

cording to the basic principles of contract law, *see United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975), and it is a fundamental principle of contract law that parties to a contract may create enforceable contract rights in a third party beneficiary. *See, e.g.,* RESTATEMENT (SECOND) OF CONTRACTS § 304 (1981); *In re Spong,* 661 F.2d 6, 10 (2d Cir.1981) ("In a third party beneficiary contract, benefits flow to both the promisee and the third party, and either may sue to enforce the contract.").

The principle that an intended third party beneficiary may sue to enforce a consent decree naturally extends, we think, to allowing the beneficiary of a trust created by a consent decree to sue for enforcement of the consent decree, even where that beneficiary was not a party to the consent decree. "In many cases it is immaterial whether a trust is created or a contract is made for the benefit of a third party.... [because] the beneficiary of a contract, as well as the beneficiary of a trust, has rights which he can enforce." 1 AUSTIN W. SCOTT, THE LAW OF TRUSTS § 14.3 (3d ed. 1967). Just as an intended third party beneficiary may sue to enforce a contract, it is equally fundamental that the beneficiary of a trust may maintain a suit to compel the trustee to perform his duties as trustee or to redress a breach of trust. *See* RESTATEMENT (SECOND) OF TRUSTS § 199 (1959).

The issue thus joined is whether the *Fagerland* Consent Decree created a trust with appellants as beneficiaries. Under the terms of the Consent Decree, the Pan Am SAP funds held in escrow pending the outcome of the *Fagerland* litigation were to be transferred "to a *trust account* to be established by defendant ALPA, which will act as *trustee* and agent for distribution of this fund to the *beneficiaries.*" Consent Decree at 7 (emphasis added). ALPA's mandatory duties as "*trustee* and agent" were first to distribute a specified portion of the funds to the *Fagerland* plaintiffs, and then to distribute all re-

---

**3.** The District Court had jurisdiction over the original *Fagerland* suit pursuant to 28 U.S.C. § 1331 (1988), because it presented federal questions arising under ERISA and the Labor–Management Reporting and Disclosure Act of 1959 (codified as amended in scattered sections of 29 U.S.C.). *See Lasky v. Continental Prods. Corp.,* 804 F.2d 250, 254 (3d Cir.1986) ("The power of a court to enter a consent decree emanates from its authority to adjudicate the rights of the parties in the first instance. The authority thereafter to [enforce] the consent decree similarly derives directly from the court's initial exercise of jurisdiction over the dispute.").

maining funds "to eligible pilots [including appellants] who are not plaintiff class members pursuant to the instructions of the Pan Am MEC." *Id.* at 8–11 (emphasis added). There is no indication in the Consent Decree that ALPA had any right to use the funds for any purpose of its own.

After examining these features of the Consent Decree, we conclude with little difficulty that the Consent Decree created a trust, with ALPA as trustee and appellants (among others) as the beneficiaries. A trust is

> a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it.

RESTATEMENT (SECOND) OF TRUSTS, *supra*, § 2; *see also, e.g., United States v. Kingsley*, 851 F.2d 16, 20–21 (1st Cir.1988) (relying on *Restatement* definition to determine whether a trust has been created); *Coleman v. Golkin, Bomback & Co., Inc.*, 562 F.2d 166, 168–69 (2d Cir.1977) (same). The *Fagerland* Consent Decree establishes just the sort of trust relationship described in the *Restatement*. Pursuant to the Consent Decree, ALPA held the title to the Pan Am SAP funds for the benefit of the *Fagerland* plaintiffs and the other Pan Am pilots, including appellants, eligible to receive those funds. Further, the Consent Decree expressly imposed on ALPA the duty of distributing the settlement payments to Pan Am pilots who had participated in the A Plan. Finally, we think it is clear that the language of the Consent Decree manifests the requisite intention to create a trust. *See* RESTATEMENT (SECOND) OF TRUSTS, *supra*, § 24(1) (necessary manifestation of intention to create a trust may be made by written words). An expressed intention to create a trust may be revealed by, *inter alia*, the articulation of the essential elements of a trust, *see id.* § 2(1) cmt. h (essential elements of a trust are a trustee, a beneficiary and a trust property), and "the specifics necessary to implement and administer the trust." 76 AM.JUR.2D

*Trusts* § 65 (1992). The Consent Decree sets out the elements of a trust, and makes clear the "specifics" for implementing and administering the trust; we are thus satisfied that a trust was indeed created. And because appellants are beneficiaries of that trust, they may sue to enforce the duties owed to them by ALPA as trustee.

ALPA contends, unpersuasively, that the *Fagerland* Consent Decree did not create a trust because, rather than establishing any enforceable duties, it conferred upon ALPA the "sole" discretion to distribute the Pan Am SAP funds. Brief for Appellee at 22. ALPA points out, purportedly in its favor, that the Consent Decree provides that the available Pan Am SAP "sums" "shall be distributed to eligible pilots ... *pursuant to the instructions of the Pan Am MEC.*" Consent Decree at 9, 11 (emphasis added). This language provides no comfort to ALPA. The mandatory "shall" makes clear that the disputed "sums" *must* be distributed to the eligible pilots, including appellants. The Consent Decree merely leaves ALPA the discretion to choose an appropriate arrangement for distributing those "sums" among the eligible pilots. This discretion is hardly remarkable as a matter of trust law; the terms of a trust often give the trustee discretion in carrying out a duty, while leaving the duty itself mandatory. *See* 3 SCOTT, *supra*, § 187 ("[W]here [the trustee] is directed to exercise a power, the time and manner of its exercise may be left to his discretion."). Absolutely nothing in the language quoted by ALPA, or in any other part of the Consent Decree, confers on ALPA the right to use any of the SAP funds for its own purposes. We therefore reject ALPA's contention that the Consent Decree did not manifest an intention to create enforceable duties.

Our ruling that appellants may maintain an action to enforce the Consent Decree is supported by FED.R.CIV.P. 71. Rule 71 provides in relevant part that "[w]hen an order is made in favor of a person who is not a party to the action, that person may enforce obedience to the order by the same process as if a party...." The courts that have allowed non-parties to sue to enforce a consent decree or other court order as intended third party beneficiaries have relied in large part on Rule 71. *See, e.g., Hook*, 972 F.2d at 1014; *Washington Hosp. v. White*, 889 F.2d 1294, 1299 (3d Cir.1989). While the precise

contours of Rule 71 may remain unclear, we think that the Rule comfortably applies to appellants in this case.[4]

Although the foregoing analysis disposes of the question of whether appellants may bring this action, we pause to distinguish some language from a Supreme Court case that may, at first glance, be interpreted as running against our decision. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). In *Blue Chip Stamps*, the Court stated that "a well-settled line of authority from this Court establishes that a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it." *Id.* at 750, 95 S.Ct. at 1932. Despite this seemingly sweeping prohibition on suits by non-parties to a consent decree, we, like the Ninth Circuit, read *Blue Chip Stamps* to "prohibit[ ] only *incidental* third party beneficiaries from suing to enforce a consent decree." *Hook*, 972 F.2d at 1015; *see also Berger*, 771 F.2d at 1565 ("[W]e think that [*Blue Chip Stamps* ] was not intended to preclude nonparties from intervening to enforce a consent decree where otherwise authorized by the federal rules of civil procedure."). *Blue Chip Stamps*, therefore, is not applicable to this case.

Five considerations lead us to conclude that the *Blue Chip Stamps* language should be read narrowly. First, the primary question before the Court in *Blue Chip Stamps* was far afield from the issue we face today: whether a consent decree requiring one party to offer stock to a third party was sufficient under federal securities laws to make the third party a "purchaser or seller" who would have standing to sue pursuant to Rule 10b–5 of the Securities and Exchange Commission.

Second, to the extent that *Blue Chip Stamps* is understood as involving a private party's attempt to bring an action under a consent decree that benefited it, *see Hook*, 972 F.2d at 1015, it bears noting that the

consent decree resulted from a civil antitrust action brought by the *Government*. Only the Government can seek enforcement of its consent decrees, *see, e.g., Dahl, Inc. v. Roy Cooper Co., Inc.*, 448 F.2d 17, 20 (9th Cir. 1971); therefore, even if the Government intended its consent decree to benefit a third party, that party could not enforce it unless the decree so provided. Given this rule, the language against third party enforcement in *Blue Chip Stamps* must be read in context and with caution, because that case involved a Government-obtained consent decree. Third, and closely related, our interpretation of *Blue Chip Stamps* accords with the basic contract principle that third party beneficiaries of a Government contract are generally assumed to be merely *incidental* beneficiaries, and may not enforce the contract absent clear intent to the contrary. *See* RESTATEMENT (SECOND) OF CONTRACTS, *supra*, § 313(2) & cmt. a. The private parties in *Blue Chip Stamps* were therefore incidental third party beneficiaries, and had no enforcement rights under the consent decree. *See Hook*, 972 F.2d at 1015 (adopting this analysis).

Fourth, were we to construe *Blue Chip Stamps* broadly, we would eviscerate Rule 71 in the context of consent decree enforcements. The Court in *Blue Chip Stamps* did not even mention Rule 71, and we are not prepared, without a clearer signal, to assume that the Court meant to narrow Rule 71 so significantly. *See Hook*, 972 F.2d at 1015. Fifth, the authorities cited by the Court in *Blue Chip Stamps* do not stand for the extremely broad proposition that the Court's language might be read to suggest. *See Blue Chip Stamps*, 421 U.S. at 750, 95 S.Ct. at 1932 (citing *United States v. Armour & Co.*, 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971); *Buckeye Coal & Ry. Co. v. Hocking Valley Ry. Co.*, 269 U.S. 42, 46 S.Ct. 61, 70 L.Ed. 155 (1925)). In *Armour*, the Court held that a corporation did not violate the terms of a particular consent decree to which it was not a party by acquiring another cor-

---

4. Some courts have emphasized that Rule 71 requires the court order to be made expressly in favor of the party who seeks to enforce the order. *See, e.g., United States v. American Soc'y of Composers, Authors and Publishers*, 341 F.2d 1003, 1008 (2d Cir.), *cert. denied*, 382 U.S. 877, 86

S.Ct. 160, 15 L.Ed.2d 119 (1965). That requirement is fulfilled here because the *Fagerland* Consent Decree provided for distribution of Pan Am SAP funds to "eligible [Pan Am] pilots," a term which includes appellants. Consent Decree at 9, 11.

poration that was a party to the consent decree. No language in that opinion suggests that non-parties intended to be benefited by a consent decree cannot sue to enforce the decree. In *Buckeye*, the Court refused to allow a coal company to seek enforcement of a consent decree to which it was not a party, but it appears that the coal company was not an intended beneficiary of the consent decree.

In sum, we conclude, as did the court in *Hook*, that the *Blue Chip Stamps* language regarding enforcement of consent decrees is best read as prohibiting, at most, suits to enforce consent decrees by incidental third party beneficiaries, or, perhaps, by third party beneficiaries of a consent decree obtained by the Government. *Blue Chip Stamps* is not relevant here, and appellants are permitted to bring this action.

### 3. *The Merits*

Having determined that the *Fagerland* Consent Decree created a trust for the benefit of eligible Pan Am pilots, including appellants, and that appellants may sue to enforce the duties that ALPA, as trustee, owed to them, we have little difficulty in further concluding, on the merits, that ALPA breached its fiduciary duty in this case. The Consent Decree imposed on ALPA the duty of undivided loyalty as trustee to the pilots, including appellants, who were the beneficiaries of the trust. It is fundamental that "[t]he trustee is under a duty to the beneficiary to administer the trust *solely in the interest of the beneficiary.*" RESTATEMENT (SECOND) OF TRUSTS, *supra*, § 170 (emphasis added). In accordance with this duty, "[t]here should be no right to set off a debt due from the beneficiary to the trustee individually and not as trustee." 12 GEORGE G. BOGERT & GEORGE T. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 814 (2d rev. ed. 1981); *accord, e.g., Alvord v. Ryan*, 212 F. 83, 87 (8th Cir.1914). The Pan Am MEC resolution, and subsequent actions taken by ALPA pursuant to that resolution, constitute a textbook violation of this rule: "all [Pan Am] pilots who are delinquent in dues, service charge or assessment payments to ALPA ... shall receive their full [SAP] payment minus all the money owed to ALPA in the form of back dues, service charges and/or assessments." Plaintiffs' Statement of Material Facts to Which There is No Genuine Issue at 7. Accordingly, we hold that ALPA breached its fiduciary duty to appellants when it retained SAP funds as a setoff against strike assessments and other agency shop fees allegedly owed to ALPA by appellants. ALPA is therefore ordered, pursuant to the terms of the trust, to distribute the disputed $161,647.26, with interest and costs, to appellants.

### III. CONCLUSION

For the foregoing reasons, we hold that under the *Fagerland* Consent Decree, ALPA held the disputed settlement funds in trust for the benefit of appellants, that appellants may sue to enforce the fiduciary duty owed to them by ALPA, and that ALPA wrongfully diverted the disputed funds in breach of its fiduciary duty when it retained them as a setoff against strike assessments and other agency shop fees owed to ALPA by appellants. Moreover, we hold that the District Court properly had jurisdiction over this claim. Accordingly, we reverse the judgment of the District Court.

*So Ordered.*

### ORDER*

#### July 23, 1993.

PER CURIAM:

Upon consideration of appellees' petition for rehearing and of the response thereto, it is

Ordered, by the Court, that the petition is denied as to the merits of the appeal. It is

Further Ordered, by the Court, that the case is remanded so that the district court may decide in the first instance (1) whether appellee raised a viable counterclaim and, if so, how that issue should be resolved, and (2) the amount of interest due appellants.

* Circuit Judge Ruth B. Ginsburg did not participate in this order.