United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued May 1, 2002 Decided June 21, 2002 

 Nos. 02-5052 & 02-5053

 Timothy C. Pigford, et al., 
 Appellees

 v.

 Ann M. Veneman, Secretary, 
 United States Department of Agriculture, 
 Appellant

 Appeals from the United States District Court 
 for the District of Columbia 
 (No. 97cv01978) 
 (No. 98cv01693)

 Howard S. Scher, Attorney, U.S. Department of Justice, 
argued the cause for appellant. With him on the briefs were 
Roscoe C. Howard, Jr., U.S. Attorney, and Robert M. Loeb, 
Attorney, U.S. Department of Justice.

 Jason A. Levine argued the cause for appellants. With 
him on the brief were Anthony Herman and Alexander J. 
Pires, Jr.

 Before: Sentelle, Randolph and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Tatel.

 Tatel, Circuit Judge: The question presented in this ap-
peal concerns a district court's authority to interpret or 
modify a consent decree--here, the settlement of a class 
action brought by over 20,000 African-American farmers 
charging the United States Department of Agriculture with 
racial discrimination in lending practices. Due to class coun-
sel's failure--"bordering on legal malpractice," the district 
court called it--to meet critical consent decree deadlines, the 
district court interpreted the decree to allow extension of 
such deadlines "so long as justice requires." Although we 
find that the district court exceeded its interpretive authority 
under the decree, we hold that class counsel's conduct justi-
fies modifying the decree under Federal Rule of Civil Proce-
dure 60(b)(5). But because the order does not satisfy the 
"tailor[ing]" requirement for a Rule 60(b)(5) modification, see 
Rufo v. Inmates of the Suffolk County Jail, 502 U.S. 367, 383 
(1992), we reverse and remand for further proceedings.

 I.

 Proceeding under the Equal Credit Opportunity Act, 15 
U.S.C. ss 1691-1691f, three African-American farmers filed 
this class action against the United States Department of 
Agriculture alleging racial discrimination in the administra-
tion of federally funded credit and benefit programs. The 
class ultimately included 22,000 similarly situated farmers 
from fifteen states. Shortly before the farmers filed suit, the 
Department released a report commissioned by then-
Secretary Dan Glickman "to address [the agency's] long-
standing civil rights problems," documented since the 1960s 
by numerous federal government "[s]tudies, reports, and task 
forces." Civil Rights Action Team, USDA, Civil Rights at 

the United States Department of Agriculture 2-3 (1997), 
available at http://www.usda.gov/news/civil/cr_next.htm. Ex-
amining the "painful history" of its dealings with African-
American farmers, the Department concluded that local cred-
it and loan agencies responsible for administering Depart-
ment programs often discriminated against the farmers. Id. 
at 6. According to the Glickman report, Department officials 
had "effectively dismantled" the Office for Civil Rights En-
forcement--the very office charged with addressing discrimi-
nation complaints. Id. at 47-48 (internal quotation marks 
and citation omitted). "[O]ften mak[ing] matters worse," the 
"complaints processing system" was a "bureaucratic night-
mare" that "processed [complaints] slowly, if at all," resulting 
in a huge "backlog," while at the same time the agency 
"proceed[ed] with farm foreclosures--even where discrimina-
tion may have contributed to the farmers' plight." Id. at 22-
25. "Minority farmers," the report concluded, "lost signifi-
cant amounts of land and potential farm income as a result of 
discrimination by [USDA] programs." Id. at 30.

 After Congress intervened to preserve the farmers' claims 
by tolling the Equal Credit Opportunity Act's two-year stat-
ute of limitations, see Pigford v. Glickman, 185 F.R.D. 82, 88-
89 (D.D.C. 1999) (citing 15 U.S.C. s 1691e(f)), the parties 
entered into a consent decree. Designed to "ensur[e] that in 
their dealings with USDA, all class members receive full and 
fair treatment that is the same as the treatment accorded to 
similarly situated white persons," the decree establishes pro-
cedures for resolving class members' individual claims. Con-
sent Decree at 2. Specifically, the decree allows class mem-
bers to choose between two claims procedures, known as 
Tracks A and B. In recognition of the fact that "most ... 
[class] members ... had little in the way of documentation or 
proof" of either discriminatory treatment or damages suf-
fered, Track A awards $50,000 to those farmers able to "meet 
only a minimal burden of proof." Pigford, 185 F.R.D. at 103. 
Track B--the mechanism at issue here--imposes no cap on 
damages, but requires farmers who choose this track, after 
limited discovery consisting "essentially [of] an exchange of 

lists of witnesses and exhibits and depositions of the opposing 
side's witnesses," to prove their claims by a preponderance of 
the evidence in one-day mini-trials before an arbitrator. Id. 
at 106. Set forth in paragraph 10 of the decree, Track B 
establishes strict time frames: the arbitrator sends a hearing 
notice within 10 days of receiving a Track B claim and holds a 
hearing no more than 150 days later; at least 90 days before 
the hearing, the Department and claimant file and serve on 
each other witness lists, summaries of direct testimony, and 
copies of all exhibits; discovery ends no later than 45 days 
before the hearing; and no fewer than 21 days before the 
hearing, both sides list witnesses they intend to cross-
examine and file summaries of all legal and factual issues. 
Consent Decree p 10(a)-(e). Track A and B decisions are 
final, except that the losing side may petition for review by a 
court-appointed monitor. Id. p p 9(a)(v), 9(b)(v), 10(i), 
12(b)(iii).

 Following notice to the class and a hearing, the district 
court approved the consent decree as "fair, adequate, and 
reasonable," pursuant to Federal Rule of Civil Procedure 23. 
Pigford, 185 F.R.D. at 113. According to the district court, 
the decree represents an "historical first step toward righting 
the wrongs visited upon thousands of African-American farm-
ers for decades by the [USDA]." Pigford v. Veneman, 127 
F. Supp. 2d 35, 40 (D.D.C. 2001). Our opinion affirming the 
district court's approval of the decree noted its importance for 
both the farmers and the government: the "United States is 
likely to provide an estimated $2 billion in debt relief and 
monetary payments in consideration for the dismissal of the 
class'[s] complaint." Pigford v. Glickman, 206 F.3d 1212, 1214 
(D.C. Cir. 2000). Ultimately, 21,546 claims were accepted for 
review--21,358 under Track A and 188 under Track B.

 The decree provided for class counsel to receive an advance 
payment of $1 million in fees to cover decree "implementa-
tion." Consent Decree p 14(b). The decree entitled counsel 
to seek additional fees under the Equal Credit Opportunity 
Act, 15 U.S.C. s 1691e(d), for their work in connection with 
filing the action and implementing the decree, Consent De-
cree p 14(a). One year into the implementation process, the 

district court "took the extraordinary step of awarding a 
second advance"--this time for $7 million. Order of the 
United States District Court for the District of Columbia at 2 
(Mar. 8, 2001) (No. 97cv01978). The Department and class 
counsel eventually settled all fee claims for $14.9 million. 
Attorneys and firms sharing the fees were: Alexander J. 
Pires, Jr., of Conlon, Frantz, Phelan, Pires & Leavy; Phillip 
L. Fraas, of Tuttle, Taylor & Heron; J.L. Chestnut, of 
Chestnut, Sanders, Sanders & Pettaway; T. Roe Frazer, of 
Langston, Frazer, Sweet & Freese; Hubbard Saunders IV, of 
The Terney Firm; Othello Cross, of Cross, Kearney & 
McKissic; Gerard Lear, of Speiser Krause; and William J. 
Smith.

 Several months after class counsel received their second fee 
advance and just two weeks prior to the deadline for filing 
petitions for monitor review for the "vast majority of claim-
ants [in both tracks]," class counsel filed an emergency 
motion seeking an extension of time. Order of the United 
States District Court for the District of Columbia at 2 (Nov. 
8, 2000) (No. 97cv01978). Counsel revealed that they had 
filed only a small fraction of the total petitions requested by 
the farmers. Concerned that "counsel's failings ... not be 
visited on their clients," id. at 3, and relying on "explicit 
assurances" by counsel as to the work load they could realis-
tically shoulder into the future, Pigford v. Veneman, 141 
F. Supp. 2d 60, 62 (D.D.C. 2001), the district court permitted 
counsel to file pro forma petitions by the original deadline and 
then to either file supporting materials or to withdraw the 
petitions at the rate of at least 400 petitions per month, see 
Order of the United States District Court for the District of 
Columbia at 5-6 (Nov. 8, 2000) (No. 97cv01978).

 A few months later, the district court observed "a very 
disturbing trend": class counsel had failed to meet their 
monthly quota "even once." Pigford, 141 F. Supp. 2d at 62. 
Worse still, counsel had "drastically cut its staff, bring[ing] 
Class Counsel's ability to represent the [farmers] into serious 
question." Id. "[A]larmed by Class Counsel's consistent 
failure" to meet decree timelines, the district court noted 
counsel's "remarkable admission that they never had a realis-

tic expectation of meeting" agreed-upon or court-ordered 
deadlines for the monitor review process. Order of the 
United States District Court for the District of Columbia at 
2-3 (Apr. 27, 2001) (No. 97cv01978). The court described 
counsel's performance as "dismal"--"border[ing] on legal mal-
practice"--and "wonder[ed]" whether class counsel would 
have been in such a predicament had they not filed "three 
new sister class actions" against the Department. Id. at 2-3 
& n.1, 5.

 The district court eventually imposed a series of escalating 
daily fines on class counsel for untimely monitor review 
filings. Pigford v. Veneman, 143 F. Supp. 2d 28, 32 (D.D.C. 
2001). Instead of simply submitting materials in support of 
their clients' petitions in a more timely fashion, however, 
counsel drastically increased the rate at which they withdrew 
petitions for monitor review--from 19% to 48%--"once again" 
leading the district court to "question Class Counsel's fidelity 
to their clients." Pigford v. Veneman, 148 F. Supp. 2d 31, 33 
& n.1 (D.D.C. 2001).

 Class counsel's failure to cope with their responsibilities 
extended to the Track B process. Consider the case of Earl 
Kitchen, a farmer from Arkansas who filed a Track B claim. 
Kitchen was initially represented by Jesse L. Kearney, a 
member of one of the firms sharing in the fee award, Cross, 
Kearney & McKissic. During the course of representing 
Kitchen, Kearney obtained extensions of several paragraph 10 
deadlines either with consent or over the Department's objec-
tion. Around the time the Department agreed to pay class 
counsel $14.9 million, Kearney missed the deadline (already 
extended by mutual consent) to submit written direct testimo-
ny. Kearney's failure could have drastic consequences, for 
absent submission of testimony, Kitchen's claim will "be 
extinguished." Appellees' Br. at 12; see also Consent Decree 
p 10(g) (putting the burden of proof on the claimant).

 In the meantime, the district court, deeply concerned about 
the decree's viability, asked the American Bar Association 
Committee on Pro Bono and Public Services to "assemble a 
team of pro bono lawyers to assist Class Counsel on an 
emergency basis." Order of the United States District Court 
for the District of Columbia at 7 (Apr. 27, 2001) (No. 

97cv01978). In response, lawyers from the Pro Bono Com-
mittee and the firms of Arnold & Porter and Crowell & 
Moring recruited some of Washington's largest law firms: 
Covington & Burling; Sidley, Austin, Brown & Wood; Step-
toe & Johnson; Swidler, Berlin, Shereff & Friedman; and 
Wilmer, Cutler, and Pickering. The district court, recogniz-
ing the competing demands on class counsel arising out of 
their representation of multiple claimants in both tracks and 
at various stages of the claims resolution process, hoped that 
this added assistance would lift the "heavy burden of Track B 
litigation from the shoulders of Class Counsel," enabling them 
to "focus on the petition [for monitor review] process." Pig-
ford, 143 F. Supp. 2d at 30 n.1.

 Pro bono counsel took over the representation of Earl 
Kitchen and asked the Department to extend the time for 
filing written direct testimony. The Department refused. As 
a result and because class counsel had apparently missed 
deadlines in other Track B cases, pro bono counsel filed a 
"motion to endow," asking the district court "to interpret (and 
if necessary, to modify) the Consent Decree, so that Arbitra-
tors have discretion to extend deadlines when strict compli-
ance with the original scheduling framework would defeat the 
Decree's overarching remedial purposes." Pls.' Mot. to En-
dow at 1. Granting the motion, the district court found it 
"implicit" in the Decree's terms that arbitrators have such 
discretion. Pigford v. Veneman, 182 F. Supp. 2d 50, 53 
(D.D.C. 2002).

 The Department appeals. At its request, we entered a stay 
pending appeal.

 II.

 District courts possess two types of authority over consent 
decrees. First, they may interpret and enforce a decree to 
the extent authorized either by the decree or by the related 
order. See Bd. of Trustees of Hotel & Rest. Employees Local 
25 v. Madison Hotel, Inc., 97 F.3d 1479, 1484 n.8 (D.C. Cir. 
1996) (observing that a district court retains enforcement 

jurisdiction over a settlement if litigants so provide in their 
stipulation of dismissal or the dismissal order incorporates 
the settlement terms). Second, they may modify a decree 
pursuant to Federal Rule of Civil Procedure 60(b)(5). See 
Rufo, 502 U.S. at 378-79 (holding that the Rule 60(b)(5) 
standard for modifying judgments applies to consent de-
crees). These two sources of authority reflect a consent 
decree's hybrid character, having qualities of both contracts 
and court orders. See id. at 378 (explaining that a consent 
decree "is contractual in nature" but also "an agreement that 
the parties desire and expect will be reflected in, and be 
enforceable as, a judicial decree").

 The farmers based their "motion to endow" on both sources 
of authority. In granting the motion, the district court 
explained that it was exercising its "authority to enforce and 
to interpret an approved Consent Decree." Pigford, 182 
F. Supp. 2d at 51. Although the court thus never addressed 
the question of its Rule 60(b)(5) authority, the farmers main-
tain that we may affirm the order on either ground. We 
consider each in turn.

 Interpretation and Enforcement

 Reasoning that the decree "explicitly allows for its con-
struction in a liberal manner," and that paragraph 10 "dele-
gate[s]" the district court's authority over Track B claims to 
arbitrators, the district court found it "implicit in the terms of 
the Consent Decree" that arbitrators "have essentially the 
same authority over Track B hearings that a trial judge 
would have over a trial or related pre-trial proceedings," 
including "discretion to allow for revision of certain deadlines, 
even after the deadlines have passed, so long as justice 
requires the revisions and provided that the burden on the 
defendant is not so great as to outweigh the interest of the 
claimant in fully presenting his or her claim." Id. at 51-53. 
The Department argues that the consent decree gives the 
district court no such authority. According to the Depart-
ment, the district court's only authority either to interpret or 
enforce the consent decree comes from paragraph 13, which 

"concern[s] ... alleged violation[s] of any provision of th[e] 
... Decree," and directs "[t]he person seeking enforcement of 
a provision of th[e] ... Decree" to attempt to resolve any 
problems without court intervention and then to seek enforce-
ment through contempt proceedings. Consent Decree p 13; 
see also id. p 21 (retaining the court's authority to enforce the 
decree through contempt proceedings). Since the farmers 
neither alleged a violation nor invoked the procedures for 
"seeking enforcement," the Department contends that the 
district court lacked jurisdiction to consider the "motion to 
endow." Defending the district court's order and relying on 
our statement in Beckett v. Air Line Pilots Ass'n that it is a 
"well-established principle that a trial court retains jurisdic-
tion to enforce its consent decrees," 995 F.2d 280, 286 (D.C. 
Cir. 1993), the farmers argue that the order was "properly 
grounded on jurisdiction 'ancillary' to that explicitly conferred 
by paragraph 13," Appellees' Br. at 21. Pursuant to this 
"ancillary jurisdiction," the farmers contend, the district court 
properly "enforce[d]" the decree's "overarching remedial pur-
poses." Id. at 20. The farmers also argue that quite apart 
from paragraph 13, the district court had "inherent" authority 
to interpret the decree. Id. at 21.

 We agree with the Department. In Kokkonen v. Guardian 
Life Insurance Co. of America, the Supreme Court held that 
a district court lacked "ancillary jurisdiction" to enforce a 
consent decree because neither the decree nor the order 
dismissing the case expressly retained jurisdiction to do so. 
511 U.S. 375, 380-81 (1994). Although Kokkonen differs from 
the situation here--the consent decree in this case does retain 
certain enforcement jurisdiction--the decision teaches that 
district courts enjoy no free-ranging "ancillary" jurisdiction to 
enforce consent decrees, but are instead constrained by the 
terms of the decree and related order. See id. at 381 
(explaining that if the dismissal order had retained jurisdic-
tion or incorporated the settlement, then "a breach of the 
agreement would be a violation of the order, and ancillary 
jurisdiction to enforce the agreement would therefore exist"). 

Accordingly, an enforcement clause limited by its plain lan-
guage, as is paragraph 13, to situations involving decree 
violations confers no ancillary jurisdiction to enforce the 
decree's "overarching ... purposes." Indeed, when the dis-
trict court approved the decree, it observed that the parties 
added the enforcement provision because the original version 
"appeared to prevent the Court from exercising jurisdiction in 
the event that the USDA did not comply with [its] terms," 
Pigford, 185 F.R.D. at 110, bolstering our view that the 
enforcement provision means what it says.

 Beckett does not warrant a different result. Not only did 
the Beckett decree preserve the district court's "jurisdiction 
over [the] case to enforce the terms of [the] ... decree," 995 
F.2d at 286, but the party seeking enforcement in Beckett--
unlike the farmers here--alleged that the other party had 
violated the decree's terms, id. at 281.

 Equally unpersuasive is the farmers' argument that we 
need not worry about paragraph 13's limitations because the 
district court possesses "inherent" interpretive power over 
the decree "whether or not for explicit enforcement pur-
poses." Appellees' Br. at 21. For one thing, we see no way 
the district court's interpretive authority can be unhinged 
from its enforcement authority. If the district court lacks 
paragraph 13 enforcement authority (because the farmers 
alleged no violation), then the farmers gain nothing from an 
interpretation that arbitrators may adjust paragraph 13 dead-
lines. Furthermore, none of the appellate cases cited by the 
farmers supports their assertion that "many cases ... have 
recognized the 'inherent' jurisdiction of courts to interpret 
consent decrees," id., apart from any enforcement power. 
Two of the cases involved decree modifications, not interpre-
tations. See Waste Mgmt. of Ohio, Inc. v. Dayton, 132 F.3d 
1142, 1146 & n.4 (6th Cir. 1997); Alberti v. Klevenhagen, 46 
F.3d 1347, 1365 (5th Cir. 1995). The third upheld, as a valid 
consent decree interpretation, a district court's imposition of 
interim deadlines not specified in the decree. See Juan F. 
By and Through Lynch v. Weicker, 37 F.3d 874 (2d Cir. 
1997). The order in that case, however--unlike the one 
here--provided for court intervention "when plaintiffs showed 
the defendant was 'likely' to be in noncompliance"; the addi-

tional deadlines represented a permissible interpretation be-
cause they served to "ensur[e] compliance." Id. at 879.

 Our conclusion that the district court's interpretive and 
enforcement authority depends on the terms of the decree 
and related court order, rather than on some "ancillary" or 
"inherent" power, comports with a consent decree's contrac-
tual character. See Rufo, 502 U.S. at 378. In this case, for 
example, the farmers and the Department bargained over 
Track B's time frames. Track B's "abbreviated and unambig-
uous deadlines," the Department candidly tells us, serve its 
interests by "limit[ing] the number of class members who ... 
opt for the Track B process and ... enhanc[ing] the govern-
ment's ability to defend against [those] claims." Appellant's 
Br. at 24-25. The parties also bargained over paragraph 13, 
agreeing to limit district court enforcement authority to situa-
tions where the decree is violated. To now hold that the 
district court, through either some "ancillary" authority to 
enforce the decree absent a violation or "inherent" authority 
to interpret it, may permit extensions of Track B deadlines 
would not only deny the Department the benefit of its bar-
gain, but would also discourage settlements. Who would sign 
a consent decree if district courts had free-ranging interpre-
tive or enforcement authority untethered from the decree's 
negotiated terms?

 Modification

 The farmers argue that even if the district court lacked 
authority to interpret the decree to allow extension of Track 
B deadlines, we may still affirm the order as a proper 
modification pursuant to Rule 60(b)(5). This rule permits 
courts, "upon such terms as are just," to "relieve a party or a 
party's legal representative from a final judgment, order, or 
proceeding ... [if] it is no longer equitable that the judgment 
should have prospective application." "[A] significant change 
in circumstances," the Supreme Court has held, may "war-
rant[ ] revision of [a] decree." Rufo, 502 U.S. at 383. Such 
changed circumstances include "unforeseen obstacles" that 

make a decree "unworkable." Id. at 384. Any modification 
must be "suitably tailored to the changed circumstances." Id. 
at 383.

 According to the farmers, two "significant change[d] ... 
circumstances" make the consent decree "unworkable." They 
first point to a "dramatic and unexpected expansion in class 
size"--from 2000 (the number originally estimated) to 22,000 
(the final number). Appellees' Br. at 31. As the Department 
points out, however, at the time the district court approved 
the decree, the parties realized the class already had between 
"15,000 and 20,000" members. Pigford, 185 F.R.D. at 94. 
Although this may well suggest that the actual increase was 
not "significant" enough to justify modification, we decline to 
resolve that issue, for the district court did not rely on the 
larger class size as a basis for the order at issue here.

 Class counsel's "inability to represent all Track B claimants 
adequately," Pigford, 182 F. Supp. 2d at 52, the farmers next 
argue, also provides a basis for a Rule 60(b)(5) modification. 
The Department concedes not only that counsel for "Kitchen 
and a number of other class members" committed "what 
appears to be malpractice," but also that this represents a 
"relevant new fact." Appellant's Br. at 28. Even so, the 
Department insists, the farmers' remedy is not to deny the 
Department the benefit of its bargained-for Track B dead-
lines, but rather to sue class counsel for malpractice. 
" '[C]lients must be held accountable for the acts and omis-
sions of their attorneys.' " Id. at 29 (quoting Pioneer Inv. 
Servs. Co. v. Brunswick Assocs., 507 U.S. 380, 396-97 (1993)).

 As a general matter, the Department is correct. In Link v. 
Wabash Railroad Co., the case on which the Department 
primarily relies, the Supreme Court held that the failure of 
plaintiff's lawyer to attend a pretrial conference justified 
dismissing the case for want of prosecution. 370 U.S. 626, 
633 (1962). Because plaintiff "voluntarily chose [his] attorney 
as his representative," the Court held, he could "[ ]not ... 
avoid the consequences of the acts or omissions of this freely 
selected agent." Id. at 633-34.

 Neither Link nor any other case the Department cites, 
however, was a class action. In this case, except for the three 
named plaintiffs, not one of the thousands of class members 
"voluntarily chose" class counsel. Quite to the contrary, by 
certifying the class, the district court effectively appointed 
counsel for the farmers. Under Rule 23(a)(4), moreover, the 
district court, as a condition of class certification, had to find 
that class counsel would "adequately protect the interests of 
the class." Fed. R. Civ. P. 23(a)(4); see also McCarthy v. 
Kleindienst, 741 F.2d 1406, 1411 n.3 (D.C. Cir. 1984) (noting 
that Rule 23's requirement of adequate representation encom-
passes "concerns about the competency of class counsel" 
(internal quotation marks and citation omitted)). Exercising 
this responsibility, the district court found that "Mr. Alexan-
der Pires and Mr. Phillip Fraas as lead counsel and Mr. J.L. 
Chestnut, Mr. Othello Cross, Mr. T. Roe Frazer, Mr. Hub-
bard T. Saunders, IV, Mr. Gerald Lear and Mr. James Myart, 
Jr., all serving as of counsel ... demonstrated that they will 
advocate vigorously for the interests of the class" and there-
fore "adequately will represent the interests of the class." 
Pigford v. Veneman, 182 F.R.D. 341, 350 (D.D.C. 1998).

 In so distinguishing Link, we do not mean to suggest that 
the presumption of client accountability for attorney conduct 
has no applicability in class actions. Certainly a contrary rule 
would make class action settlements problematic. Moreover, 
the Rule 23(a)(4) finding of class counsel adequacy may 
partially substitute for the free choice found in conventional 
non-class litigation. Like most presumptions, however, this 
one is rebuttable. And in litigation involving a class--defined 
from the outset by its numerosity--where counsel is not in 
fact freely chosen by class members, it is logical that the 
presumption should be more easily overcome than if the 
clients had in fact freely chosen their attorneys.

 At oral argument, the Department pointed out that even 
though the farmers may not have "freely selected" class 
counsel to pursue the underlying litigation, the decree per-
mits them to choose other lawyers for Track A or B represen-
tation. Accordingly, the Department argues, holding the 
farmers accountable for their lawyers' dismal performance is 

perfectly appropriate. We disagree. Although the decree 
technically permits class members to retain other lawyers, we 
think the circumstances of this case, together with the terms 
of the decree itself, make such choices unlikely. For one 
thing, the decree prohibits lawyers from charging for their 
work in claims proceedings, see Consent Decree p 5(e), so 
lawyers desiring payment must seek fees pursuant to the 
Equal Credit Opportunity Act, 15 U.S.C. s 1691e(d). Class 
counsel, however, received an advance fee award to provide 
such services. Class counsel also benefit from the district 
court's Rule 23 seal of approval. No wonder Earl Kitchen 
(the only claimant for whom the record contains relevant 
information) was represented by Jesse Kearney, a member of 
one of the firms that shared in the fee advance and ultimately 
the $14.9 million settlement. Because Kitchen did not "volun-
tarily cho[o]se" Kearney in the usual sense, we see no basis 
for holding Kitchen responsible for Kearney's failure to file 
direct testimony on time.

 Contrary to the Department's argument, we see nothing 
unfair about this result. Although we have no doubt that the 
Department expected Track B's tight deadlines to discourage 
claims--even to make them less winnable--the Department 
never counted on class counsel's virtual malpractice. Indeed, 
the decree itself assumes competent representation for the 
farmers. The decree's express purpose is to "ensur[e] that in 
their dealings with USDA, all class members receive full and 
fair treatment," Consent Decree at 2, and its "main accom-
plishment was the establishment of a process to adjudicate 
individual claims." Opinion and Order of the United States 
District Court for the District of Columbia at 8 (Mar. 8, 2001) 
(No. 97cv01978) (emphasis added). Unless the farmers have 
competent counsel, we cannot imagine how they could ever 
obtain "full and fair treatment" in a claims process where (as 
in Kitchen's case) missing a single deadline could be fatal.

 For all of these reasons, we conclude that class counsel's 
failure to meet critical Track B deadlines amounts to an 
"unforeseen obstacle" that makes the decree "unworkable." 
Rufo, 502 U.S. at 384. To hold otherwise would sanction the 
farmers' double betrayal: first by the Department, see Civil 

Rights at the United States Department of Agriculture 2-30, 
and then by their own lawyers.

 Having said all this, however, we cannot affirm the chal-
lenged order as a proper Rule 60(b)(5) modification because 
of Rufo's second requirement--that the modification be "suit-
ably tailored to the changed circumstances." 502 U.S. at 391. 
Because the district court viewed its order as an interpreta-
tion, not a modification, it had no occasion to consider the 
tailoring requirement. In our view, the order, vesting arbi-
trators with generic authority to revise deadlines "so long as 
justice requires," Pigford, 182 F. Supp. 2d at 52-53, is far too 
broad. Although the order restores the farmers to the 
position in which they would have been but for counsel's 
dismal performance (it may even, as the Department argues, 
put them in a better position), the order potentially deprives 
the Department of all Track B deadlines. By contrast, a 
"suitably tailored" order would return both parties as nearly 
as possible to where they would have been absent counsel's 
failures. In Kitchen's case, a properly "tailored" remedy 
would, for example, reset the Track B clock at the point in 
the process where Kearney dropped the ball, establishing a 
new deadline for submitting direct testimony and leaving 
subsequent deadlines unchanged. Whatever tailoring method 
the district court ultimately adopts, see United States v. 
Western Elec. Co., 46 F.3d 1198, 1207 (D.C. Cir. 1995) (recog-
nizing a district court's "considerable discretion" in fashioning 
a Rule 60(b)(5) modification), it must preserve the essence of 
the parties' bargain: for the farmers, an opportunity to have 
their individual claims pursued by competent counsel; and for 
the Department, the benefit of the consent decree's tight 
deadlines.

 III.

 We reverse the district court's order and remand the case 
for proceedings consistent with this opinion, Rule 60(b)(5), 
and Rufo v. Inmates of the Suffolk County Jail, 502 U.S. 367, 
377 (1992). See 28 U.S.C. s 2106 (authorizing federal appel-
late courts to "remand the cause and ... require such further 

proceedings to be had as may be just under the circum-
stances").

 So ordered.