Timothy C. PIGFORD, et al., Appellees,

v.

Ann M. VENEMAN, Secretary, United
States Department of Agriculture,
Appellant.

Nos. 02–5052 & 02–5053.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 1, 2002.

Decided June 21, 2002.

Howard S. Scher, Attorney, U.S. Department of Justice, argued the cause for appellant. With him on the briefs were Roscoe C. Howard, Jr., U.S. Attorney, and Robert M. Loeb, Attorney, U.S. Department of Justice.

Jason A. Levine argued the cause for appellants. With him on the brief were Anthony Herman and Alexander J. Pires, Jr.

Before: SENTELLE, RANDOLPH and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

The question presented in this appeal concerns a district court's authority to interpret or modify a consent decree—here, the settlement of a class action brought by over 20,000 African–American farmers charging the United States Department of Agriculture with racial discrimination in lending practices. Due to class counsel's failure—"bordering on legal malpractice," the district court called it—to meet critical consent decree deadlines, the district court interpreted the decree to allow extension of such deadlines "so long as justice requires." Although we find that the district court exceeded its interpretive authority under the decree, we hold that class counsel's conduct justifies modifying the decree under Federal Rule of Civil Procedure 60(b)(5). But because the order does not satisfy the "tailor[ing]" requirement for a Rule 60(b)(5) modification, *see Rufo v. In-*

*mates of the Suffolk County Jail,* 502 U.S. 367, 383, 112 S.Ct. 748, 760, 116 L.Ed.2d 867 (1992), we reverse and remand for further proceedings.

## I.

Proceeding under the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691–1691f, three African–American farmers filed this class action against the United States Department of Agriculture alleging racial discrimination in the administration of federally funded credit and benefit programs. The class ultimately included 22,000 similarly situated farmers from fifteen states. Shortly before the farmers filed suit, the Department released a report commissioned by then-Secretary Dan Glickman "to address [the agency's] long-standing civil rights problems," documented since the 1960s by numerous federal government "[s]tudies, reports, and task forces." CIVIL RIGHTS ACTION TEAM,. USDA, CIVIL RIGHTS AT THE UNITED STATES DEPARTMENT OF AGRICULTURE 2–3 (1997), *available at* http://www.usda.gov/news/civil/cr_next.htm. Examining the "painful history" of its dealings with African–American farmers, the Department concluded that local credit and loan agencies responsible for administering Department programs often discriminated against the farmers. *Id.* at 6. According to the Glickman report, Department officials had "effectively dismantled" the Office for Civil Rights Enforcement—the very office charged with addressing discrimination complaints. *Id.* at 47–48 (internal quotation marks and citation omitted). "[O]ften mak[ing] matters worse," the "complaints processing system" was a "bureaucratic nightmare" that "processed [complaints] slowly, if at all," resulting in a huge "backlog," while at the same time the agency "proceed[ed] with farm foreclosures—even where discrimination may have contributed to the farmers' plight." *Id.* at 22–25. "Minority farmers," the report concluded, "lost significant amounts of land and potential farm income as a result of discrimination by [USDA] programs." *Id.* at 30.

After Congress intervened to preserve the farmers' claims by tolling the Equal Credit Opportunity Act's two-year statute of limitations, *see Pigford v. Glickman,* 185 F.R.D. 82, 88–89 (D.D.C.1999) (citing 15 U.S.C. § 1691e(f)), the parties entered into a consent decree. Designed to "ensur[e] that in their dealings with USDA, all class members receive full and fair treatment that is the same as the treatment accorded to similarly situated white persons," the decree establishes procedures for resolving class members' individual claims. Consent Decree at 2. Specifically, the decree allows class members to choose between two claims procedures, known as Tracks A and B. In recognition of the fact that "most ... [class] members ... had little in the way of documentation or proof" of either discriminatory treatment or damages suffered, Track A awards $50,000 to those farmers able to "meet only a minimal burden of proof." *Pigford,* 185 F.R.D. at 103. Track B—the mechanism at issue here—imposes no cap on damages, but requires farmers who choose this track, after limited discovery consisting "essentially [of] an exchange of lists of witnesses and exhibits and depositions of the opposing side's witnesses," to prove their claims by a preponderance of the evidence in one-day minitrials before an arbitrator. *Id.* at 106. Set forth in paragraph 10 of the decree, Track B establishes strict time frames: the arbitrator sends a hearing notice within 10 days of receiving a Track B claim and holds a hearing no more than 150 days later; at least 90 days before the hearing, the Department and claimant file and serve on each other witness lists, summaries of direct testimony, and copies of all exhibits; discovery ends no later than 45 days before the hearing; and no fewer than 21 days before the hearing, both sides

list witnesses they intend to crossexamine and file summaries of all legal and factual issues. Consent Decree ¶ 10(a)–(e). Track A and B decisions are final, except that the losing side may petition for review by a court-appointed monitor. *Id.* ¶ ¶ 9(a)(v), 9(b)(v), 10(i), 12(b)(iii).

Following notice to the class and a hearing, the district court approved the consent decree as "fair, adequate, and reasonable," pursuant to Federal Rule of Civil Procedure 23. *Pigford,* 185 F.R.D. at 113. According to the district court, the decree represents an "historical first step toward righting the wrongs visited upon thousands of African–American farmers for decades by the [USDA]." *Pigford v. Glickman,* 127 F.Supp.2d 35, 40 (D.D.C. 2001). Our opinion affirming the district court's approval of the decree noted its importance for both the farmers and the government: the "United States is likely to provide an estimated $2 billion in debt relief and monetary payments in consideration for the dismissal of the class'[s] complaint." *Pigford v. Glickman,* 206 F.3d 1212, 1214 (D.C.Cir.2000). Ultimately, 21,-546 claims were accepted for review—21,-358 under Track A and 188 under Track B.

The decree provided for class counsel to receive an advance payment of $1 million in fees to cover decree "implementation." Consent Decree ¶ 14(b). The decree entitled counsel to seek additional fees under the Equal Credit Opportunity Act, 15 U.S.C. § 1691e(d), for their work in connection with filing the action and implementing the decree, Consent Decree ¶ 14(a). One year into the implementation process, the district court "took the extraordinary step of awarding a second advance"—this time for $7 million. Order of the United States District Court for the District of Columbia at 2 (Mar. 8, 2001) (No. 97cv01978). The Department and class counsel eventually settled all fee claims for $14.9 million. Attorneys and

firms sharing the fees were: Alexander J. Pires, Jr., of Conlon, Frantz, Phelan, Pires & Leavy; Philip L. Fracas, of Tattle, Tabor & Heron; JB. Chestnut, of Chestnut, Sanders, Sanders & Pettily; T. Roe Framer, of Langshan, Frazer, Sweet & Freese; Hubbard Saunders IV, of The Terney Firm; Othello Cross, of Cross, Kearney & McKissic; Gerard Lear, of Speiser Krause; and William J. Smith.

Several months after class counsel received their second fee advance and just two weeks prior to the deadline for filing petitions for monitor review for the "vast majority of claimants [in both tracks]," class counsel filed an emergency motion seeking an extension of time. Order of the United States District Court for the District of Columbia at 2 (Nov. 8, 2000) (No. 97cv01978). Counsel revealed that they had filed only a small fraction of the total petitions requested by the farmers. Concerned that "counsel's failings ... not be visited on their clients," *id.* at 3, and relying on "explicit assurances" by counsel as to the work load they could realistically shoulder into the future, *Pigford v. Veneman,* 141 F.Supp.2d 60, 62 (D.D.C.2001), the district court permitted counsel to file pro forma petitions by the original deadline and then to either file supporting materials or to withdraw the petitions at the rate of at least 400 petitions per month, *see* Order of the United States District Court for the District of Columbia at 5–6 (Nov. 8, 2000) (No. 97cv01978).

A few months later, the district court observed "a very disturbing trend": class counsel had failed to meet their monthly quota "even once." *Pigford,* 141 F.Supp.2d at 62. Worse still, counsel had "drastically cut [their] staff, bring[ing] Class Counsel's ability to represent the [farmers] into serious question." *Id.* "[A]larmed by Class Counsel's consistent failure" to meet decree timelines, the dis-

trict court noted counsel's "remarkable admission that they never had a realistic expectation of meeting" agreed-upon or court-ordered deadlines for the monitor review process. Order of the United States District Court for the District of Columbia at 2–3 (Apr. 27, 2001) (No. 97cv01978). The court described counsel's performance as "dismal"—"border[ing] on legal malpractice"—and "wonder[ed]" whether class counsel would have been in such a predicament had they not filed "three new sister class actions" against the Department. *Id.* at 2–3 & nn. 1, 5.

The district court eventually imposed a series of escalating daily fines on class counsel for untimely monitor review filings. *Pigford v. Veneman,* 143 F.Supp.2d 28, 32 (D.D.C.2001). Instead of simply submitting materials in support of their clients' petitions in a more timely fashion, however, counsel drastically increased the rate at which they *withdrew* petitions for monitor review—from 19% to 48%—"once again" leading the district court to "question Class Counsel's fidelity to their clients." *Pigford v. Veneman,* 148 F.Supp.2d 31, 33 & n. 1 (D.D.C.2001).

Class counsel's failure to cope with their responsibilities extended to the Track B process. Consider the case of Earl Kitchen, a farmer from Arkansas who filed a Track B claim. Kitchen was initially represented by Jesse L. Kearney, a member of one of the firms sharing in the fee award, Cross, Kearney & McKissic. During the course of representing Kitchen, Kearney obtained extensions of several paragraph 10 deadlines either with consent or over the Department's objection. Around the time the Department agreed to pay class counsel $14.9 million, Kearney missed the deadline (already extended by mutual consent) to submit written direct testimony. Kearney's failure could have drastic consequences, for absent submission of testimony, Kitchen's claim will "be

extinguished." Appellees' Br. at 12; *see also* Consent Decree ¶ 10(g) (putting the burden of proof on the claimant).

In the meantime, the district court, deeply concerned about the decree's viability, asked the American Bar Association Committee on Pro Bono and Public Services to "assemble a team of *pro bono* lawyers to assist Class Counsel on an emergency basis." Order of the United States District Court for the District of Columbia at 7 (Apr. 27, 2001) (No. 97cv01978). In response, lawyers from the Pro Bono Committee and the firms of Arnold & Porter and Crowell & Moring recruited some of Washington's largest law firms: Covington & Burling; Sidley, Austin, Brown & Wood; Steptoe & Johnson; Swidler, Berlin, Shereff & Friedman; and Wilmer, Cutler, and Pickering. The district court, recognizing the competing demands on class counsel arising out of their representation of multiple claimants in both tracks and at various stages of the claims resolution process, hoped that this added assistance would lift the "heavy burden of Track B litigation from the shoulders of Class Counsel," enabling them to "focus on the petition [for monitor review] process." *Pigford,* 143 F.Supp.2d at 30 n. 1.

Pro bono counsel took over the representation of Earl Kitchen and asked the Department to extend the time for filing written direct testimony. The Department refused. As a result and because class counsel had apparently missed deadlines in other Track B cases, pro bono counsel filed a "motion to endow," asking the district court "to interpret (and if necessary, to modify) the Consent Decree, so that Arbitrators have discretion to extend deadlines when strict compliance with the original scheduling framework would defeat the Decree's overarching remedial purposes." Pls.' Mot. to Endow at 1.

Granting the motion, the district court found it "implicit" in the Decree's terms that arbitrators have such discretion. *Pigford v. Veneman*, 182 F.Supp.2d 50, 53 (D.D.C.2002).

The Department appeals. At its request, we entered a stay pending appeal.

## II.

■ District courts possess two types of authority over consent decrees. First, they may interpret and enforce a decree to the extent authorized either by the decree or by the related order. *See Bd. of Trustees of Hotel & Rest. Employees Local 25 v. Madison Hotel, Inc.*, 97 F.3d 1479, 1484 n. 8 (D.C.Cir.1996) (observing that a district court retains enforcement jurisdiction over a settlement if litigants so provide in their stipulation of dismissal or the dismissal order incorporates the settlement terms). Second, they may modify a decree pursuant to Federal Rule of Civil Procedure 60(b)(5). *See Rufo*, 502 U.S. at 378–79, 112 S.Ct. at 757–58 (holding that the Rule 60(b)(5) standard for modifying judgments applies to consent decrees). These two sources of authority reflect a consent decree's hybrid character, having qualities of both contracts and court orders. *See id.* at 378, 112 S.Ct. at 757 (explaining that a consent decree "is contractual in nature" but also "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree").

The farmers based their "motion to endow" on both sources of authority. In granting the motion, the district court explained that it was exercising its "authority to enforce and to interpret an approved Consent Decree." *Pigford*, 182 F.Supp.2d at 51. Although the court thus never addressed the question of its Rule 60(b)(5) authority, the farmers maintain that we may affirm the order on either ground. We consider each in turn.

## Interpretation and Enforcement

Reasoning that the decree "explicitly allows for its construction in a liberal manner," and that paragraph 10 "delegate[s]" the district court's authority over Track B claims to arbitrators, the district court found it "implicit in the terms of the Consent Decree" that arbitrators "have essentially the same authority over Track B hearings that a trial judge would have over a trial or related pre-trial proceedings," including "discretion to allow for revision of certain deadlines, *even after the deadlines have passed,* so long as justice requires the revisions and provided that the burden on the defendant is not so great as to outweigh the interest of the claimant in fully presenting his or her claim." *Id.* at 51–53. The Department argues that the consent decree gives the district court no such authority. According to the Department, the district court's only authority either to interpret or enforce the consent decree comes from paragraph 13, which "concern[s] ... alleged violation[s] of any provision of th[e] ... Decree," and directs "[t]he person seeking enforcement of a provision of th[e] ... Decree" to attempt to resolve any problems without court intervention and then to seek enforcement through contempt proceedings. Consent Decree ¶ 13; *see also id.* ¶ 21 (retaining the court's authority to enforce the decree through contempt proceedings). Since the farmers neither alleged a violation nor invoked the procedures for "seeking enforcement," the Department contends that the district court lacked jurisdiction to consider the "motion to endow." Defending the district court's order and relying on our statement in *Beckett v. Air Line Pilots Ass'n* that it is a "well-established principle that a trial court retains jurisdiction to enforce its consent decrees," 995 F.2d 280, 286 (D.C.Cir.1993), the farmers argue that the order was "properly grounded on jurisdiction 'ancillary' to that explicitly con-

ferred by paragraph 13," Appellees' Br. at 21. Pursuant to this "ancillary jurisdiction," the farmers contend, the district court properly "enforce[d]" the decree's "overarching remedial purposes." *Id.* at 20. The farmers also argue that quite apart from paragraph 13, the district court had "inherent" authority to interpret the decree. *Id.* at 21.

■ We agree with the Department. In *Kokkonen v. Guardian Life Insurance Co. of America,* the Supreme Court held that a district court lacked "ancillary jurisdiction" to enforce a consent decree because neither the decree nor the order dismissing the case expressly retained jurisdiction to do so. 511 U.S. 375, 380–81, 114 S.Ct. 1673, 1676–77, 128 L.Ed.2d 391 (1994). Although *Kokkonen* differs from the situation here—the consent decree in this case does retain certain enforcement jurisdiction—the decision teaches that district courts enjoy no free-ranging "ancillary" jurisdiction to enforce consent decrees, but are instead constrained by the terms of the decree and related order. *See id.* at 381, 114 S.Ct. at 1677 (explaining that if the dismissal order had retained jurisdiction or incorporated the settlement, then "a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist"). Accordingly, an enforcement clause limited by its plain language, as is paragraph 13, to situations involving decree violations confers no ancillary jurisdiction to enforce the decree's "overarching ... purposes." Indeed, when the district court approved the decree, it observed that the parties added the enforcement provision because the original version "appeared to prevent the Court from exercising jurisdiction in the event that the USDA did not comply with [its] terms," *Pigford,* 185 F.R.D. at 110, bolstering our view that the enforcement provision means what it says.

*Beckett* does not warrant a different result. Not only did the *Beckett* decree preserve the district court's "jurisdiction over [the] case to enforce the terms of [the] ... decree," 995 F.2d at 286, but the party seeking enforcement in *Beckett*—unlike the farmers here—alleged that the other party had violated the decree's terms, *id.* at 281.

■ Equally unpersuasive is the farmers' argument that we need not worry about paragraph 13's limitations because the district court possesses "inherent" interpretive power over the decree "whether or not for explicit enforcement purposes." Appellees' Br. at 21. For one thing, we see no way the district court's interpretive authority can be unhinged from its enforcement authority. If the district court lacks paragraph 13 enforcement authority (because the farmers alleged no violation), then the farmers gain nothing from an interpretation that arbitrators may adjust paragraph 13 deadlines. Furthermore, none of the appellate cases cited by the farmers supports their assertion that "many cases ... have recognized the 'inherent' jurisdiction of courts to interpret consent decrees," *id.,* apart from any enforcement power. Two of the cases involved decree modifications, not interpretations. *See Waste Mgmt. of Ohio, Inc. v. Dayton,* 132 F.3d 1142, 1146 & n. 4 (6th Cir.1997); *Alberti v. Klevenhagen,* 46 F.3d 1347, 1365 (5th Cir.1995). The third upheld, as a valid consent decree interpretation, a district court's imposition of interim deadlines not specified in the decree. *See Juan F. By and Through Lynch v. Weicker,* 37 F.3d 874 (2d Cir.1994). The order in that case, however—unlike the one here—provided for court intervention "when plaintiffs showed the defendant was 'likely' to be in noncompliance"; the additional deadlines represented a permissible

interpretation because they served to "ensur[e] compliance." *Id.* at 879.

■ Our conclusion that the district court's interpretive and enforcement authority depends on the terms of the decree and related court order, rather than on some "ancillary" or "inherent" power, comports with a consent decree's contractual character. *See Rufo,* 502 U.S. at 378, 112 S.Ct. at 757. In this case, for example, the farmers and the Department bargained over Track B's time frames. Track B's "abbreviated and unambiguous deadlines," the Department candidly tells us, serve its interests by "limit[ing] the number of class members who ... opt for the Track B process and ... enhanc[ing] the government's ability to defend against [those] claims." Appellant's Br. at 24–25. The parties also bargained over paragraph 13, agreeing to limit district court enforcement authority to situations where the decree is violated. To hold now that the district court, through either some "ancillary" authority to enforce the decree absent a violation or some "inherent" authority to interpret it, may permit extensions of Track B deadlines would not only deny the Department the benefit of its bargain, but would also discourage settlements. Who would sign a consent decree if district courts had free-ranging interpretive or enforcement authority untethered from the decree's negotiated terms?

*Modification*

The farmers argue that even if the district court lacked authority to interpret the decree to allow extension of Track B deadlines, we may still affirm the order as a proper modification pursuant to Rule 60(b)(5). This rule permits courts, "upon such terms as are just," to "relieve a party or a party's legal representative from a final judgment, order, or proceeding ... [if] it is no longer equitable that the judgment should have prospective application."

"[A] significant change in circumstances," the Supreme Court has held, may "warrant[ ] revision of [a] decree." *Rufo,* 502 U.S. at 383, 112 S.Ct. at 760. Such changed circumstances include "unforeseen obstacles" that make a decree "unworkable." *Id.* at 384, 112 S.Ct. at 760. Any modification must be "suitably tailored to the changed circumstances." *Id.* at 370, 112 S.Ct. at 753.

According to the farmers, two "significant change[d] ... circumstances" make the consent decree "unworkable." They first point to a "dramatic and unexpected expansion in class size"—from 2000 (the number originally estimated) to 22,000 (the final number). Appellees' Br. at 31. As the Department points out, however, at the time the district court approved the decree, the parties realized the class already had between "15,000 and 20,000" members. *Pigford,* 185 F.R.D. at 94. Although this may well suggest that the actual increase was not "significant" enough to justify modification, we decline to resolve that issue, for the district court did not rely on the larger class size as a basis for the order at issue here.

■ Class counsel's "inability to represent all Track B claimants adequately," *Pigford,* 182 F.Supp.2d at 52, the farmers next argue, also provides a basis for a Rule 60(b)(5) modification. The Department concedes not only that counsel for "Kitchen and a number of other class members" committed "what appears to be malpractice," but also that this represents a "relevant new fact." Appellant's Br. at 28. Even so, the Department insists, the farmers' remedy is not to deny the Department the benefit of its bargained-for Track B deadlines, but rather to sue class counsel for malpractice. " '[C]lients must be held accountable for the acts and omissions of their attorneys.' " *Id.* at 29 (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs.,*

507 U.S. 380, 396–97, 113 S.Ct. 1489, 1499, 123 L.Ed.2d 74 (1993)).

As a general matter, the Department is correct. In *Link v. Wabash Railroad Co.*, the case on which the Department primarily relies, the Supreme Court held that the failure of plaintiff's lawyer to attend a pretrial conference justified dismissing the case for want of prosecution. 370 U.S. 626, 633, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734 (1962). Because plaintiff "voluntarily chose [his] attorney as his representative," the Court held, he could "[ ]not ... avoid the consequences of the acts or omissions of this freely selected agent." *Id.* at 633–34, 82 S.Ct. at 1390.

Neither *Link* nor any other case the Department cites, however, was a class action. In this case, except for the three named plaintiffs, not one of the thousands of class members "voluntarily chose" class counsel. Quite to the contrary, by certifying the class, the district court effectively appointed counsel for the farmers. Under Rule 23(a)(4), moreover, the district court, as a condition of class certification, had to find that class counsel would "adequately protect the interests of the class." FED. R.CIV.P. 23(a)(4); *see also McCarthy v. Kleindienst*, 741 F.2d 1406, 1411 n. 3 (D.C.Cir.1984) (noting that Rule 23's requirement of adequate representation encompasses "concerns about the competency of class counsel" (internal quotation marks and citation omitted)). Exercising this responsibility, the district court found that "Mr. Alexander Pires and Mr. Phillip Fraas as lead counsel and Mr. J.L. Chestnut, Mr. Othello Cross, Mr. T. Roe Frazer, Mr. Hubbard T. Saunders, IV, Mr. Gerald Lear and Mr. James Myart, Jr., all serving as of counsel ... demonstrated that they will advocate vigorously for the interests of the class" and therefore "adequately will represent the interests of the class." *Pigford v. Glickman*, 182 F.R.D. 341, 350 (D.D.C.1998).

■ In so distinguishing *Link,* we do not mean to suggest that the presumption of client accountability for attorney conduct has no applicability in class actions. Certainly a contrary rule would make class action settlements problematic. Moreover, the Rule 23(a)(4) finding of class counsel adequacy may partially substitute for the free choice found in conventional non-class litigation. Like most presumptions, however, this one is rebuttable. And in litigation involving a class—defined from the outset by its numerosity—where counsel is not in fact freely chosen by class members, it is logical that the presumption should be more easily overcome than if the clients had in fact freely chosen their attorneys.

At oral argument, the Department pointed out that even though the farmers may not have "freely selected" class counsel to pursue the underlying litigation, the decree permits them to choose other lawyers for Track A or B representation. Accordingly, the Department argues, holding the farmers accountable for their lawyers' dismal performance is perfectly appropriate. We disagree. Although the decree technically permits class members to retain other lawyers, we think the circumstances of this case, together with the terms of the decree itself, make such choices unlikely. For one thing, the decree prohibits lawyers from charging for their work in claims proceedings, *see* Consent Decree ¶ 5(e), so lawyers desiring payment must seek fees pursuant to the Equal Credit Opportunity Act, 15 U.S.C. § 1691e(d). Class counsel, however, received an advance fee award to provide such services. Class counsel also benefit from the district court's Rule 23 seal of approval. No wonder Earl Kitchen (the only claimant for whom the record contains relevant information) was represented by Jesse Kearney, a member of one of the firms that shared in the fee advance and ultimately the $14.9 million settlement.

Because Kitchen did not "voluntarily cho[o]se" Kearney in the usual sense, we see no basis for holding Kitchen responsible for Kearney's failure to file direct testimony on time.

Contrary to the Department's argument, we see nothing unfair about this result. Although we have no doubt that the Department expected Track B's tight deadlines to discourage claims—even to make them less winnable—the Department never counted on class counsel's virtual malpractice. Indeed, the decree itself assumes competent representation for the farmers. The decree's express purpose is to "ensur[e] that in their dealings with USDA, all class members receive full and fair treatment," Consent Decree at 2, and its "main accomplishment was the *establishment of a process* to adjudicate individual claims." Opinion and Order of the United States District Court for the District of Columbia at 8 (Mar. 8, 2001) (No. 97cv01978) (emphasis added). Unless the farmers have competent counsel, we cannot imagine how they could ever obtain "full and fair treatment" in a claims process where (as in Kitchen's case) missing a single deadline could be fatal.

For all of these reasons, we conclude that class counsel's failure to meet critical Track B deadlines amounts to an "unforeseen obstacle" that makes the decree "unworkable." *Rufo*, 502 U.S. at 384, 112 S.Ct. at 760. To hold otherwise would sanction the farmers' double betrayal: first by the Department, *see* CIVIL RIGHTS AT THE UNITED STATES DEPARTMENT OF AGRICULTURE 2–30, and then by their own lawyers.

■ Having said all this, however, we cannot affirm the challenged order as a proper Rule 60(b)(5) modification because of *Rufo*'s second requirement—that the modification be "suitably tailored to the changed circumstances." 502 U.S. at 391, 112 S.Ct. at 763. Because the district court viewed its order as an interpretation, not a modification, it had no occasion to consider the tailoring requirement. In our view, the order, vesting arbitrators with generic authority to revise deadlines "so long as justice requires," *Pigford*, 182 F.Supp.2d at 52–53, is far too broad. Although the order restores the farmers to the position in which they would have been but for counsel's dismal performance (it may even, as the Department argues, put them in a better position), the order potentially deprives the Department of all Track B deadlines. By contrast, a "suitably tailored" order would return *both* parties as nearly as possible to where they would have been absent counsel's failures. In Kitchen's case, a properly "tailored" remedy would, for example, reset the Track B clock at the point in the process where Kearney dropped the ball, establishing a new deadline for submitting direct testimony and leaving subsequent deadlines unchanged. Whatever tailoring method the district court ultimately adopts, *see United States v. Western Elec. Co.*, 46 F.3d 1198, 1207 (D.C.Cir.1995) (recognizing a district court's "considerable discretion" in fashioning a Rule 60(b)(5) modification), it must preserve the essence of the parties' bargain: for the farmers, an opportunity to have their individual claims pursued by competent counsel; and for the Department, the benefit of the consent decree's tight deadlines.

### III.

We reverse the district court's order and remand the case for proceedings consistent with this opinion, Rule 60(b)(5), and *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 377, 112 S.Ct. 748, 756–57, 116 L.Ed.2d 867 (1992). *See* 28 U.S.C. § 2106 (authorizing federal appellate courts to "remand the cause and ... re-

quire such further proceedings to be had as may be just under the circumstances").

*So ordered.*